# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

JERMAINE HUGHEY,

    Petitioner,

v.                                                    No. 10-2552-JPM-cgc

ROBERT E. COOPER, JR.,

    Respondent.

---

**ORDER TO MODIFY THE DOCKET**
**ORDER DENYING RESPONDENT'S MOTIONS**
**ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254**
**ORDER DENYING CERTIFICATE OF APPEALABILITY**
**ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH**
**and**
**ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

---

Before the Court is the Petition Under 28 U.S.C.A. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition") filed by Petitioner Jermaine Hughey ("Petitioner" or "Hughey"), Tennessee Department of Correction ("TDOC") prisoner number 369284, who was formerly an inmate at the Riverbend Maximum Security Institution ("RMSI") in Nashville, Tennessee, filed on July 29, 2010.[1] (ECF No. 1.) Also before the Court are Respondent's Motion for Waiver of Local Rule 56.1(a) (ECF No.

---

[1]    According to the TDOC website, Petitioner has been released on parole. He has not provided the Clerk with a forwarding address. The Clerk is directed to substitute Tennessee Attorney General Robert E. Cooper, Jr., for Ricky Bell as Respondent in this action. See Fed. R. Civ. P. 25(d).

16), Motion for Summary Judgment (ECF No. 17), and Motion to Dismiss for Lack of Prosecution (ECF No. 18). For the reasons stated herein, the Petition is DENIED and the Respondent's pending motions are also DENIED.

**I.   BACKGROUND**

  **A.   State-Court Procedural History**

On January 16, 2003, a grand jury in Shelby County, Tennessee, returned two indictments against Hughey. Case Number 03-00283 charged Hughey with eight counts arising from the events of August 9, 2002.[2] Counts One and Two charged Hughey with the aggravated robbery of Maria Tirado; Counts Three and Four charged Hughey with the aggravated robbery of Jose Savin; Counts Five and Six charged Hughey with the aggravated robbery of Eldidio Savin; and Count Seven charged Hughey with the attempted aggravated robbery of Jose Cerda.[3]

Case Number 03-00284 charged Hughey and Deverance Bledsoe with eight counts arising from the events of August 30, 2002.[4] Counts One and Two charged both defendants with the aggravated robbery of Carlos Villapando; Counts Three and Four charged both defendants with the aggravated robbery of Jose Cerda; Counts Five and Six charged both defendants with the aggravated robbery of

---

[2]    Indictment, <u>State v. Hughey</u>, No. 03-00283 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 174-81.

[3]    <u>Id.</u>

[4]    Indictment, <u>State v. Hughey</u>, No. 03-000284 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 182-90.

Jose Savin; and Counts Seven and Eight charged both defendants with the aggravated robbery of Eldidio Savin.[5]

A jury trial on the charges against Hughey commenced in the Shelby County Criminal Court on November 17, 2003. At the close of proof, the trial judge reduced the charges in Counts One, Two, Three, and Four of Case Number 03-00283, and Counts One and Two of Case Number 03-00284, to attempted aggravated robbery.[6] On November 21, 2003, the jury returned a guilty verdict on each count of the indictments.[7]

At a sentencing hearing on February 27, 2004, Hughey was sentenced as a Range I Standard Offender to concurrent terms of eleven (11) years on each of the aggravated robberies, and to five (5) years on each of the attempted aggravated robberies.[8] In Case Number 03-00283, the trial judge ordered that the three attempted robbery sentences be served concurrently to each other and consecutively to the aggravated-robbery conviction, for a total sentence of sixteen (16) years.[9] In Case Number 03-00284, the trial judge ordered that the three aggravated-robbery and one attempted- aggravated-robbery sentences be served concurrently to

---

[5]     Id.

[6]     Trial Tr. at 587-90, State v. Hughey, No. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-2 at PageID 909-12.

[7]     Id. at 666-68, ECF No. 14-2 at PageID 996-98.

[8]     Sentencing Hr'g Tr. at 39, State v. Hughey, No. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-2 at PageID 1040.

[9]     Id. at 39-43, ECF No. 14-2 at PageID 1040-44.

3

each other, for a total sentence of eleven (11) years.[10] Finally, the trial judge ordered that the sentences for Case Numbers 03-00283 and 03-00284 be served consecutively to each other, for a total sentence on both indictments of twenty-seven (27) years.[11] The Tennessee Court of Criminal Appeals affirmed. State v. Hughey, No. W2004-01074-CCA-R3-CD, 2006 WL 2000734 (Tenn. Crim. App. July 18, 2006), perm. app. denied (Tenn. Nov. 13, 2006).

On November 14, 2007, Hughey filed a pro se petition in the Shelby County Criminal Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122.[12] After counsel was appointed to represent Hughey,[13] an Amended and Supplemental Petition was filed on or about September 24, 2008.[14] Another amendment was filed on February 12, 2009.[15] The post-conviction court held hearings on the Petition for Post-

---

[10]   Id.

[11]   Id.; Judgments, State v. Hughey, No. 03-00283 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 212-15; Judgments, State v. Hughey, No. 03-00284 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 216-19.

[12]   Pet. for Post-Conviction Relief, Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1083-1111.

[13]   Order Appointing Private Counsel to Represent Indigent Pet'r, Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1124.

[14]   Am. & Suppl. Pet. for Post-Conviction Relief, Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1112-22.

[15]   Additional Grounds to Am. & Suppl. Pet. for Post-Conviction Relief, Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1125-27.

Conviction Relief on December 17, 2008,[16] and March 30, 2009.[17] The post-conviction court denied relief on May 8, 2009.[18] The Tennessee Court of Criminal Appeals affirmed. Hughey v. State, No. W2009-01072-CCA-R3-PC, 2010 WL 1610581 (Tenn. Crim. App. Apr. 21, 2010).

In Hughey's appeal of his conviction and sentence, the Tennessee Court of Criminal Appeals summarized the evidence introduced at trial:

> Elpidio Aaron Savin Torres testified that he had lived in Memphis for three years and was from Mexico but was not an American citizen. He said that in August 2002, he was the victim of two robberies at his brother's apartment. He said that on August 9, 2002, between 11:00 a.m. and noon, he went to his brother's apartment to ask him about finding work. He said that he was in the bedroom with his brother, Jose Miguel Savin Torres, and that his sister-in-law, Maria Conception Tirado, was in the bathroom or kitchen. He said that his brother-in-law, Jose Yahir Cerda Gutierrez, was at the apartment and that Mr. Gutierrez told him he was going outside to smoke a cigarette. He said he was standing up to go outside with Mr. Gutierrez when he heard Mr. Gutierrez say, "We are f------ up. They want our money."
>
> Elpidio Torres testified that a man with a small black gun told them to go inside and told his sister-in-law to come into the room. He said the man told them to get on the ground because "I believe he didn't want us to see him." He said that the man said, "Give me your wallet," and that he took out his wallet and showed the

---

[16]    December 17, 2008, Post-Conviction Relief Hr'g Tr. ("December 17, 2008, Hr'g Tr."), Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1153-94.

[17]    March 30, 2009, Post-Conviction Relief Hr'g Tr. ("March 30, 2009, Hr'g Tr."), Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1195-1234.

[18]    Order Denying Pet. for Post-Conviction Relief, Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1128-36.

man it contained no money before giving the man ten dollars from his pocket. He said the man also took his cell phone and was pointing the gun at him. He said his sister-in-law spoke English and told the man they did not have any money because they were not working at the time. He said the man told them he was leaving and was going to count to ten. He said that as the man was counting and closing the door, his sister-in-law called the police. He said he did not recognize the man who robbed him at the time of the robbery. He said he was able to get a good look at the man inside the apartment and could see the man's face. He said that the man touched the door handle as he was leaving the apartment and that the police took fingerprints from the door handle. He said his sister-in-law translated for him when the police arrived.

Elpidio Torres testified that he again saw the man who robbed him on August 30, 2002, around 5:30 to 6:30 p.m., when the man robbed him a second time. He said that he and his brother were outside his brother's apartment talking to a neighbor about the previous robbery and that his brother was washing his truck. He said that he saw two black men and that he said, "Oh, oh, here they come again. They're either going to rob us or they're after us." He said that he knew it was the same man who had robbed him previously when he saw the man coming toward him and that he had no doubt it was the same man. He said that the man he recognized had a gun and that the other man did not have a weapon. He said the two men approached him, his brother, Mr. Gutierrez, and the neighbor who had been asking about the previous robbery. He said the two men frisked them and asked for their money. He said that he threw his wallet and that the robbers took seven or eight dollars. He said the man with the gun pointed it at him while the other man went through his pockets. He said he was fearful because "these things happen all the time. Sometimes they take your money and they still kill you." He said his sister-in-law was inside the apartment, and they told her to call the police. He identified the defendant in the courtroom as the man who robbed him twice.

Elpidio Torres testified that he saw the defendant after the second robbery when he and Mr. Gutierrez were in the parking lot of the apartment complex. He said that he saw the defendant walk over to the park and that he told his brother and sister-in-law that he had seen the man who robbed him twice. He said that a friend, Nacho,

drove his brother and sister-in-law over to the park but that he did not go with them. He said that he did not see the police make an arrest and that he was not asked to identify anyone at the time. He said he gave a statement to the police and identified the defendant from two photographs. He said an interpreter who worked at the police department translated for him. He said he had no doubt the man he identified in the photograph, the defendant, was the man who robbed him.

On cross-examination, Elpidio Torres acknowledged he had testified he "glanced" four times at the defendant inside his brother's apartment. He said he also watched the defendant out of the corner of his eye. He said he saw the robber face-to-face when the robber was coming in but only saw a profile of the robber when he was picking up their wallets. He acknowledged his sister-in-law translated for him when the police asked him to describe the robber after the first robbery. He acknowledged he told his brother and sister-in-law the man who robbed them was in the park with a cell phone and told them where to look.

Elpidio Torres acknowledged he went with his brother and sister-in-law to the police station to look at some photographs on September 6, 2002. He said that he identified the photograph of the defendant and that he was not present when his sister-in-law viewed the photographs and made an identification. He said his sister-in-law had not gone over his statement with him. He acknowledged that the day before he testified at the trial, he told his brother and sister-in-law that the defendant was "free" and not in jail because he had seen the defendant walking in the hallway. He denied talking to Mr. Gutierrez about identifying someone in court. He acknowledged the defendant was the only black man sitting in the courtroom where the accused normally would sit.

On re-direct examination, Elpidio Torres testified that he met with the assistant district attorney and Ms. Merediz, the interpreter, to discuss his testimony but that no one else was in the room. He said he and Mr. Gutierrez had seen the defendant in the hallway the day before while there was a break in the trial. He said that he recognized the defendant at the preliminary hearing and that he identified the defendant because he recognized the defendant as the man who robbed him and

not because he was the man in the photograph he was shown.

Jose Yahir Cerda Gutierrez testified that he was from Mexico and had lived in Memphis for three and one-half years. He said that on August 9, 2002, he was living in an apartment with Ms. Tirado and Jose Torres, and Elpidio Torres was visiting. He said he went outside to smoke and saw a black man come from behind a car. He said that he first saw the man from about five to six meters away and that the man told him, "Give me your money," in English. He said that he was bending down and that the man pointed the gun at his head. He said he stood up, and the man reached into his pockets and took one dollar. He demonstrated how the man pushed him inside with the gun pointed at him. He said the man threw him onto the floor and asked for the other three victims' wallets. He said the man checked the other victims for money but only took money and a cell phone from Elpidio Torres. He said that he had never seen the robber before the robbery but that he saw the robber's face both inside and outside of the apartment.

Mr. Gutierrez testified that he saw the robber again when he was robbed a second time outside his apartment. He said he, Jose Torres, Elpidio Torres, and a neighbor were outside the apartment standing at the back of a truck. He said that he saw the defendant and another man come from the front of the truck and that the defendant had a gun. He said he recognized the defendant as the same man who had robbed him previously. He said the defendant pointed the gun at them while the other man checked their pockets. He said they took twenty dollars from him and took money from two of the other victims. He said that after they took the money, the two men walked away behind the apartment complex.

Mr. Gutierrez testified that he saw the defendant three or four days after the second robbery when the defendant walked in front of the car in which Mr. Gutierrez was riding. He said that the defendant was with three other people and that he walked to the park near the apartment complex. He said he was approximately five to six meters away from the defendant and was surprised to see him. He said that Elpidio Torres told Ms. Tirado and Jose Torres about seeing the defendant and that he remained at the apartment while they went to see if it was the man who robbed them. He said he did not see the

8

police arrest the defendant and was not asked to identify him at the apartment complex. He said that he gave a statement to the police at the police station and that an interpreter who worked at the office translated for him. He said the police officers showed him a photograph lineup with several pictures on one page and showed him an individual photograph. He said he was able to identify the man who robbed him because he would never forget him. He identified the defendant at the trial as the man who robbed him on both occasions. He said he was one "hundred percent" sure the defendant was the man who robbed him twice.

On cross-examination, Mr. Gutierrez testified that he had never seen the defendant before the first robbery. He said Elpidio Torres told Jose Torres and Ms. Tirado that they had seen the black man who robbed them in the park but did not say anything else to describe him. He acknowledged he identified the defendant's photograph on September 6, 2002. He also acknowledged a police officer showed him a six-photograph lineup on September 10, 2002, at his apartment. He acknowledged he told the police officer he was not sure if the picture he selected was the second robber from the second robbery. He acknowledged he identified the defendant at a previous hearing but was unable to identify the other robber. He said he was one-hundred percent sure the defendant was the man who robbed him.

Memphis Police Officer Patricia Turnmire testified that she worked for the crime-scene unit and that on August 9, 2002, between 11:20 a.m. and noon, she went to the Waterstone Landing Apartments to investigate a home invasion. She said she took photographs of the scene and fingerprinted the doorknob but found no fingerprints.

Memphis Police Sergeant Joseph Pearlman testified that he investigated two robberies on August 9 and 30, 2002, occurring at the same location. He said Ms. Tirado said she thought the robber lived in the apartment complex because she thought she had seen him before. He said he later received a telephone call from Ms. Tirado who said she had seen the man who robbed them. He said that he told her to watch the man until the police could get there and that she called back to say the police had arrested the man. He said they called the victims and asked them to come into the robbery office to give statements. He said that a clerk in the robbery office

9

spoke Spanish and translated for them and that the
victims were separated when they gave their statements
and made photograph identifications. He said they showed
the victims a single photograph because Ms. Tirado had
identified the defendant to the police as the man who had
robbed them. He said the photograph lineup shown to the
victims contained a photograph of Deverance Bledsoe, the
co-defendant, in the second robbery. He said the gun was
never recovered from either robbery.

On cross-examination, Sergeant Pearlman acknowledged
that he could have shown the victims a photograph lineup
with the defendant instead of a single photograph but did
not. He acknowledged he wrote in his report that Ms.
Tirado, Jose Torres, and Mr. Gutierrez identified the
defendant as the male who robbed them when the police
arrived at the park. He said that when he made the
report, he asked Ms. Tirado if the other three victims
had seen the person who was arrested and that Ms. Tirado
said they had. He acknowledged he relied on Officer
Cartwright's report on the first robbery to make his
report. He acknowledged that he obtained a search warrant
to search the defendant's apartment but that they did not
find any money or weapons.

Memphis Police Officer John Morris testified that on
September 2, 2002, around 4:00 p.m., he arrested the
defendant after one of the victims called the police and
reported seeing the man who robbed her. He said that he
went to the Waterstone Landing Apartments and that a park
was in the apartment complex. He said that he saw a black
male that matched the description he had received over
the radio and that he stopped the man and asked for his
identification. He said that he called Sergeant Pearlman
and that Sergeant Pearlman was talking to the victim. He
said that the victim said she could see them and that the
man they had was the person who robbed her. He said that
he arrested the man and that he did not take the man over
to the witness. He identified the defendant as the man he
arrested.    On    cross-examination,    Officer    Morris
acknowledged the defendant did not have a gun on him when
he was arrested.

Memphis Police Officer Timothy Reynolds testified
that he arrested the defendant for the second robbery at
the defendant's apartment at Waterstone Apartments. He
said that Deverance Bledsoe was there when the defendant
was arrested but that he did not arrest Mr. Bledsoe until

a week or two later. Officer Reynolds acknowledged that the defendant did not have a gun on his person and that he did not see a gun in plain view in the defendant's apartment.

Jose Miguel Savin Torres testified that he was from Baja, California, and southern Mexico and that he spoke a little English. He said that he lived in Memphis for approximately three and a half years and that he was robbed twice. He said that the first robbery occurred at his apartment on a Friday between 11:00 a.m. and noon and that his wife, his brother, and Mr. Gutierrez were there. He said he was in his bedroom when he saw Mr. Gutierrez walk in with "his face of fear." He said that a man with a gun asked for their wallets and that he threw his wallet on the floor. He said the robber picked it up, saw there was no money in it, and said, "I want money." He said the robber took money and a cell phone from his brother. He said he was looking at the robber the entire time until the robber told him to lie on the floor. He said that after the robber left, he called 9-1-1 and said, "I need help." He said he told the operator a man with a gun was inside his house. He said he gave the phone to his wife after the operator asked him a question he did not understand.

Jose Torres testified that he saw the robber again a week or two later when he was robbed a second time. He said that the robbery occurred around 6:00 p.m., that he was outside cleaning his truck, and that it was light outside. He said he, his brother, Mr. Gutierrez, and Mr. Villapando, were talking about the first robbery. He said the man who robbed him came up to them carrying a gun and told them to give him their money. He said that another man was with the robber and that the other man checked their pockets. He said he recognized the man with the gun as the man who had robbed him previously. He said the robbers took money from him.

Jose Torres testified that he again saw the man who robbed them at the park in his apartment. He said that his brother told him, "He's at the park," and that he recognized the man from the two robberies when he saw him in the park. He said his wife called the police on her cell phone and gave them a description of the man. He said he saw the police stop the man. He said that he went to the police station with the other victims to give a statement but that when he gave his statement only the

11

police officer and a translator were there. He said that
he spoke to the assistant district attorney the day
before he testified and that his wife translated for him
because Ms. Merediz was not there. He identified the
defendant in the courtroom as the man who robbed him
twice.

On cross-examination, Jose Torres acknowledged that
he did not see money taken from Mr. Gutierrez during the
first robbery. He said money was taken from his brother
during the first robbery. He acknowledged his brother
told him the man who robbed them was in the park and told
him how the man was dressed. He said that he saw the
police arrest the defendant and that he and his wife
drove past the defendant while he was being arrested.

Maria Conception Tirado testified that she spoke
both English and Spanish. She said that she had lived in
Memphis and that she was the victim of a robbery. She
said that Mr. Gutierrez walked into the apartment with
someone behind him and that she thought he needed someone
to translate for him. She said that when the black man
turned, she saw he had a gun pointed at Mr. Gutierrez'
ribs. She said the lighting in the apartment was clear,
the blinds were open, and the lamp was on. She said the
man told her to go into the kitchen, then called her into
the hall, pushed her into the bedroom, and told her to
lie on the floor. She said she told the man she could not
lie on the floor because she was eight and a half months
pregnant. She said that the man said, "Give me your f
money" and that he had the gun pointed at them. She said
the man took money and a cell phone from Elpidio Torres
but did not take anything from anyone else in the room.
She said the man may have taken something from Mr.
Gutierrez when they were outside. She said that before
leaving, the man said, "Count to ten, close your eyes,
and do not say anything." She said that her husband
called 9-1-1 and that she grabbed the phone from him once
she heard the man leave the apartment. She said she was
able to see the robber when he first walked in and during
the robbery when she was two feet from him. She said that
she recognized the robber from the apartment complex and
that she told the police she had seen him around the
apartments before.

Ms. Tirado testified that two or three weeks after
the robbery, her husband, Jose Torres, ran into the
house, locked the door, and said, "They robbed us again.

Please call 9-1-1. It's the same guy." She said that two
days after her husband was robbed the second time,
Elpidio Torres told her, "The guy is in the park." She
said her brother told her the man was wearing a brown
shirt. She said that she and her husband went to the park
in a friend's car and that she saw a group of men. She
said that she looked at the man in the brown shirt and
that she recognized him from the first robbery. She said
she called 9-1-1 from a cell phone and gave the operator
the report number for the robbery. She said that the
police came and that she saw the police arrest the man.
She said that she also called Sergeant Pearlman and that
Sergeant Pearlman told her to give the police a sign that
they had the right man. She said she gave a sign to one
of the officers when they drove past the police car. She
said that Sergeant Pearlman asked if she was sure it was
the man and that she said she was.

    Ms. Tirado testified that she gave a statement at
the police station and that she was not with the other
victims when she gave the statement. She said she did not
translate for the other victims at the police station.
She said she did translate during the week of the trial
for the assistant district attorney when he was going
over her husband's statement with her husband. She
identified the defendant in the courtroom as the man who
robbed her. On cross-examination, Ms. Tirado testified
that she stared at the defendant for approximately five
minutes while he was in the park until she knew he was
the robber.

State v. Hughey, 2006 WL 2000734, at *1-7.

## B.   Procedural History of Hughey's § 2254 Petition

On July 29, 2010, Hughey filed his pro se Petition (ECF No.

1), accompanied by motions seeking leave to proceed in forma

pauperis (ECF No. 2), and appointment of counsel (ECF No. 3). In

an Order issued on August 16, 2010, then-United States District

Judge Bernice B. Donald granted leave to proceed in forma

pauperis. (ECF No. 4.) On October 6, 2010, Judge Donald denied

the Motion for Appointment of Counsel and directed Respondent to

13

file the state-court record and a response to the Petition. (ECF
No. 6.)[19] On January 27, 2011, Respondent filed his Answer to
Petition (ECF No. 13) and the state-court record (ECF No. 14).
Petitioner did not file a Reply.

On April 29, 2013, Respondent filed a Motion for Waiver of
Local Rule 56.1(a) (ECF No. 16) and a Motion for Summary Judgment
(ECF No. 17). Petitioner has not responded to the motions. The
argument presented in the Motion for Summary Judgment is
substantially similar to that in the Answer. Respondent's Motion,
however, does not adequately state why a summary-judgment motion
is appropriate in this case, how the Court is to apply the
summary-judgment standard if Respondent is excused from
submitting a statement of undisputed facts, nor how the summary-
judgment standard differs from the review conducted by the Court
under Rule 8(a) of the Rules Governing Section 2254 Cases in the
United States District Courts ("§ 2254 Rules") upon receipt of
the Answer, Reply, and state-court record. Because these
procedural issues can be avoided by assessing Petitioner's claims
under Rule 8(a), Respondent's Motions (ECF No. 16; ECF No. 17)
are DENIED as unnecessary.

On May 24, 2013, Respondent filed a Motion to Dismiss for
Lack of Prosecution. (ECF No. 18.) Petitioner has not responded

---

[19]    The case was reassigned to United States District Judge S. Thomas
Anderson on December 29, 2011 (ECF No. 15), to United States District Judge John
T. Fowlkes, Jr. on August 3, 2012 (ECF No. 19), and to the undersigned judge on
July 23, 2013 (ECF No. 20).

to the Motion. The Motion states that Petitioner was released on parole at an unspecified time and has failed to provide a forwarding address. The TDOC website reflects that Hughey has been released on parole, but does not provide the date of his release. Respondent states that Petitioner's copy of Respondent's Motion for Summary Judgment  was returned as undeliverable on May 1, 2013. (<u>See</u> ECF No. 18-1 at 1; ECF No. 18-2.)

Respondent also argues that "the petitioner has not prosecuted his case in almost three years." (ECF No. 18-1 at 2.) The Section 2254 Rules do not require habeas petitioners to take any actions beyond the filing of their petitions. The Federal Rules of Civil Procedure and this Court's Local Rules also do not permit the Court to grant summary judgment because of a party's failure to respond. <u>See</u> LR 7.2(a)(2) ("Failure to respond timely to any motion, <u>other than one requesting dismissal of a claim or action</u>, may be deemed good grounds for granting the motion.") (emphasis added).

In the absence of any evidence that Petitioner has been released for a lengthy period of time, the Court is unable to conclude at this time that Petitioner has failed to prosecute the action. Accordingly, Respondent's Motion to Dismiss for Lack of Prosecution (ECF No. 18) is DENIED.[20]

---

[20]     Notably, Respondent has not argued that the Petition is moot. A habeas petition ordinarily is not rendered moot by the prisoner's release. <u>Sibron v. New York</u>, 392 U.S. 40, 51 (1968).

## II.   PETITIONER'S FEDERAL HABEAS CLAIMS

In the instant Petition, Hughey raises the following issues:

1.   Whether his conviction was obtained by the unconstitutional failure of the State to disclose exculpatory evidence or by a "suggestive investigation;"

2.   Whether his attorney rendered ineffective assistance, in violation of the Sixth Amendment;

3.   Whether the prosecutor committed misconduct; and

4.   Whether his sentences are excessive.

(ECF No. 1 at 5-12, 19-29.)

## III. THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.   Waiver and Procedural Default

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same

claim sought to be redressed in a federal habeas court to the
state courts. <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011).
The petitioner must "fairly present"[21] each claim to all levels
of state-court review, up to and including the state's highest
court on discretionary review, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29
(2004), except where the state has explicitly disavowed state
supreme court review as an available state remedy, <u>O'Sullivan v.
Boerckel</u>, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court
Rule 39 eliminated the need to seek review in the Tennessee
Supreme Court in order to "be deemed to have exhausted all
available state remedies." <u>Adams v. Holland</u>, 330 F.3d 398, 402
(6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39) (internal
quotation marks omitted); <u>see</u> <u>Smith v. Morgan</u>, 371 F. App'x 575,
579 (6th Cir. 2010) (per curiam) (stating the <u>Adams</u> holding
promotes comity by requiring that "state courts have the first
opportunity to review and evaluate claims that might undermine a
state criminal conviction, but also mandates that the federal
courts respect the duly-promulgated rule of the Tennessee Supreme
Court that recognizes the law and policy-making function of that
court and the court's desire not to be entangled in the business
of simple error correction").

---

[21] For a claim to be exhausted, "[i]t is not enough that all the facts
necessary to support the federal claim were before the state courts, or that a
somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6
(1982) (per curiam) (citation omitted). Nor is it enough to make a general
appeal to a broad constitutional guarantee. <u>Gray v. Netherland</u>, 518 U.S. 152,
163 (1996).

The procedural-default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural-default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977); accord Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (stating a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state-court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 732; see Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (stating the procedural-default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in

a fundamental miscarriage of justice. <u>Schlup v. Delo</u>, 513 U.S. 298, 322 (1995); <u>Coleman</u>, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. <u>Schlup</u>, 513 U.S. at 321; <u>see</u> <u>House v. Bell</u>, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

**B.   Merits Review**

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be

given the benefit of the doubt." <u>Cullen</u>, 131 S. Ct. at 1398

(internal quotation marks omitted).[22]

Review under § 2254(d)(1) is limited to the record that was

before the state court that adjudicated the claim on the merits.

<u>Cullen</u>, 131 S. Ct. at 1398-99. A state court's decision is

"contrary" to federal law when it "arrives at a conclusion

opposite to that reached" by the Supreme Court on a question of

law or "decides a case differently than" the Supreme Court has

"on a set of materially indistinguishable facts." <u>Williams v.

Taylor</u>, 529 U.S. 362, 412-13 (2000).[23] An "unreasonable

application" of federal law occurs when the state court

"identifies the correct governing legal principle from" the

Supreme Court's decisions "but unreasonably applies that

principle to the facts of the prisoner's case." <u>Id.</u> at 413. The

state court's application of clearly established federal law must

be "objectively unreasonable." <u>Id.</u> at 409. The writ may not issue

merely because the habeas court, in its independent judgment,

determines that the state-court decision applied clearly

established federal law erroneously or incorrectly. <u>Renico v.

Lett</u>, 559 U.S. 766, 773 (2010); <u>Williams</u>, 529 U.S. at 411.

--------------------------------------------------

[22]    The AEDPA standard creates "a substantially higher threshold" for
obtaining relief than a de novo review of whether the state court's determination
was incorrect. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).

[23]    The "contrary to" standard does not require citation of Supreme Court
cases "so long as neither the reasoning nor the result of the state-court
decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam);
<u>accord</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16 (2003) (per curiam); <u>Treesh v.
Bagley</u>, 612 F.3d 424, 429 (6th Cir. 2010).

There is little case law addressing the standard in
§ 2254(d)(2) that a decision was based on "an unreasonable
determination of facts." However, in Wood v. Allen, 558 U.S. 290,
301 (2010), the Supreme Court stated that a state-court factual
determination is not "unreasonable" merely because the federal
habeas court would have reached a different conclusion. In Rice
v. Collins, 546 U.S. 333, 341-42 (2006), the Court explained that
"[r]easonable minds reviewing the record might disagree" about
the factual finding in question, "but on habeas review that does
not suffice to supersede the trial court's . . .
determination."[24]

"Notwithstanding the presumption of correctness, the Supreme
Court has explained that the standard of § 2254(d)(2) is
demanding but not insatiable. Accordingly, '[e]ven in the context
of federal habeas, deference does not imply abandonment or
abdication of judicial review.'" Harris v. Haeberlin, 526 F.3d
903, 910 (6th Cir. 2008) (quoting Miller-El v. Cockrell, 537 U.S.
322, 324, 340 (2003)) (internal quotations omitted). A state-
court adjudication on the merits and "based on a factual
determination will not be overturned on factual grounds unless

---

[24]     In Wood, the Supreme Court granted certiorari to resolve whether, to
satisfy § 2254(d)(2), a petitioner must establish only that the state-court
factual determination on which the decision was based was "unreasonable," or
whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption
that the determination was correct with clear and convincing evidence. The Court
ultimately found it unnecessary to reach that issue. Wood, 558 U.S. at 300-03.
In Rice, the Court recognized that it is unsettled whether there are some factual
disputes where § 2254(e)(1) is inapplicable. Rice, 546 U.S. at 339.

objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Ayers v. Hudson</u>, 623 F.3d 301, 308 (6th Cir. 2010) (quoting <u>Cockrell</u>, 537 U.S. at 340) (internal quotation marks omitted).

## IV. ANALYSIS OF PETITIONER'S CLAIMS

### A. The Alleged <u>Brady</u> Violation and "Suggestive Investigation" ("Claim 1")

In his first claim for relief, Hughey argues that his conviction was caused by the State's failure to disclose exculpatory evidence or, alternatively, by a suggestive investigation. (ECF No. 1 at 5-6, 19-21.) Specifically, Hughey complained that the State withheld a police report about the August 9, 2002, robbery in which the victims described their assailant as "[d]ark complexioned, thin build, clean shaven, with diamond stud earrings (plural)." (<u>Id.</u> at 19; <u>see</u> ECF No. 1-2 at PageID 56.) Hughey states, "I happen to be a highly-light complexioned African-American, stocky build, low college cut and facial, and I've NEVER had a single piercing." (ECF No. 1 at 19.) Hughey discovered this report after he had been sentenced. (<u>Id.</u>)

Hughey also asserts that the victims' identifications of him were mistaken. He states that the victims were never required to pick him out of a line-up and, instead, were shown only a photograph of him. (<u>Id.</u>) Hughey contends that this procedure was unduly suggestive. Hughey also asserts that the victims' trial

testimony establishes that they had insufficient opportunity to observe their assailant. (Id. at 19-20.)

In his initial post-conviction petition, Hughey raised a Brady claim[25] based on the State's failure to produce the initial police report.[26] Hughey's initial petition also argued that trial counsel was ineffective in failing to investigate whether the victims had given prior inconsistent statements.[27] An amendment to the petition filed by post-conviction counsel asserted that trial counsel was ineffective by failing to notify Hughey of the potentially exculpatory police report.[28] After the post-conviction hearings, the post-conviction court rejected the ineffective-assistance claim on the merits.[29] The post-conviction court also summarily denied various other issues including the Brady claim, stating that, "[a]lthough these issues were raised in his written Petition, Mr. Hughey failed to prove any of the issues by clear and convincing evidence."[30] Hughey's brief to the

---

[25]    Brady v. Maryland, 373 U.S. 83 (1963).

[26]    Pet. for Post-Conviction Relief at 4, 11-13, Hughey v. State, Nos. 03-00283-94 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1086, 1093-95.

[27]    Id. at 21-23, ECF No. 14-3 at PageID 1103-05.

[28]    Additional Grounds to Am. & Suppl. Pet. for Post-Conviction Relief, Hughey v. State, Nos. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1125-27.

[29]    Order Denying Pet. for Post-Conviction Relief at 7-8, Hughey v. State, Nos. 03-00283-94 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1134-35.

[30]    Id. at 7, ECF No. 14-3 at PageID 1134.

        The testimony at the post-conviction hearings does not establish that
                                                              (continued...)

Tennessee Court of Criminal Appeals on the post-conviction appeal raised the issue as an ineffective-assistance claim.[31] Hughey, however, did not raise his challenge to the allegedly suggestive police investigation before any state court.

Therefore, Hughey has failed to properly exhaust Claim 1 in the state court and, because there is no longer any means to do so, the issues are barred by procedural default.[32] Accordingly, the Court finds Claim 1 is without merit and is DISMISSED.

---

[30]     (...continued)
there was a Brady violation. Hughey's trial counsel, Leslie Ballin, testified that he had no independent recollection of whether the police report was produced in discovery. March 30, 2009, Hr'g Tr. 8-9, Hughey v. State, Nos. 03-00283-94 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1202-03. Ballin testified that it was his practice to share the information obtained in discovery with the defendants he represents. Id. Ballin concluded that "the exhibit that was just handed to me, I have no independent recollection of. I can tell you that if it was in the discovery pack, I had it. And if it was in the discovery pack, I would have shared it with Mr. Hughey." Id. at 11:15-19, ECF No. 14-3 at PageID 1205:15-19. Hughey was represented by Mark Mesler at the sentencing hearing, and Hughey testified that he obtained the police report from Mesler. Id. at 22, ECF No. 14-3 at PageID 1216. Hughey stated that he did not receive the report from Ballin. Id. No evidence was offered regarding how Mesler obtained the report. Mesler testified that he had access to Ballin's file. December 17, 2008, Hr'g Tr. 35-36, Hughey v. State, Nos. 03-00283-94 (Shelby Cnty. Crim. Ct.), ECF No. 14-3 at PageID 1187-88.

[31]     See Br. of Appellant at 4, 14, Hughey v. State, C.C.A. No. W2009-01072-CCA-R3-PC (Tenn. Crim. App.), ECF No. 14-10 at PageID 1475, 1485.

[32]     The Court declines to address, sua sponte, whether Hughey might be entitled to relief from his procedural default in light of the Supreme Court's decisions in Martinez v. Ryan, 132 S. Ct. 1309, 1320 (2012), and Trevino v. Thaler, 133 S. Ct. 1911, 1921 (2013). The Court is not persuaded that Claim 1 is a substantial claim. As previously noted, see supra n.26, there is no evidence of a Brady violation. Moreover, in denying relief on the ineffective-assistance claim, the Tennessee Court of Criminal Appeals adopted the post-conviction court's analysis that Hughey had failed to show prejudice "given the strong identification proof that was introduced at the trial." Hughey v. State, 2010 WL 1610581, at *5. The Tennessee Court of Criminal Appeals quoted the post-conviction court's finding that the "proof of identity was overwhelming. The victims saw petitioner in the neighborhood on multiple occasions and called police to the location where he was arrested." Id. (internal quotation marks omitted).

**B.    Prosecutorial and Judicial Misconduct ("Claim 3")**[33]

In his third claim, Hughey complains of "Prosecutorial/Magisterial Misconduct." (ECF No. 1 at 8-10, 23-27.) Specifically, Hughey complains that the prosecutor commented on his right not to testify during voir dire (id. at 23-24), vouched for the credibility of the victims during his closing argument (id. at 24), and commented about other robberies of Mexican nationals (id.).

Hughey also asserts that the trial judge exhibited bias by allowing witnesses to testify about other robberies involving Hispanic victims and allowed the victims to speculate about Hughey's state of mind. (Id. at 24-26.) Hughey also contends the trial judge exhibited bias by refusing to let defense counsel question the victims about their legal status in the country. (Id. at 25-26.) Hughey contends the questions were relevant to the victims' prior bad acts and the answers were probative of the victims' truthfulness. (Id.) Finally, Hughey contends the trial judge improperly allowed the prosecutor to comment on Hughey's right not to testify during voir dire and allowed the prosecutor to make improper statements during closing arguments. (Id. at 26.)

On direct appeal, Hughey argued that the prosecutor committed misconduct by commenting during voir dire on Hughey's

---

[33]    In the interest of clarity, the Court will address Claims 3 and 4 before addressing Claim 2.

right not to testify[34] and commenting during closing arguments
about other, unrelated crimes against Mexicans.[35] The Tennessee
Court of Criminal Appeals denied relief on these issues, stating
as follows:

> The defendant contends the trial court erred in
> allowing the prosecutor to make improper comments during
> voir dire and in closing arguments. The state responds
> that the trial court did not err in allowing the state's
> comments during voir dire about the defendant's right to
> testify or in allowing the prosecutor's statements in
> closing argument.

### A. Voir Dire

> The defendant contends the trial court erred by
> allowing the prosecutor to make improper comments during
> the voir dire process about the defendant's right not to
> testify. He claims that any adverse comment made by the
> prosecutor upon failure of the defendant to testify
> constitutes a violation of the defendant's rights. He
> contends the violation is reversible error unless the
> trial judge requires counsel to stop and properly
> instructs the jury.

> The state responds that the trial court properly
> allowed the prosecutor to make comments during voir dire
> that the defendant was not required to testify at the
> trial. The state asserts that the defendant did not
> contemporaneously object to the prosecutor's comments and
> did not ask the court for a curative instruction. The
> state argues that the comment was harmless beyond a
> reasonable doubt given the context in which it was made.
> It asserts the prosecutor's intent in making the
> statement was to impress on the jury that if the
> defendant chose to testify, his credibility should be
> judged the same as any other witness. The state asserts
> the defendant objected only after the prosecutor
> mentioned the defendant's right to testify three times.

---

[34]     See Br. of Def./Appellant Jermaine Hughey, at ii, 17-18, State v.
Hughey, C.C.A. No. W2004-01074-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-4 at
PageID 1237, 1260-61.

[35]     See id. at ii, 29-32, ECF No. 14-4 at PageID 1237, 1263-66.

The state asserts the trial court charged the jury before deliberations about the defendant's right not to testify.

During voir dire, the assistant district attorney made the following statements regarding the defendant's right not to testify:

> The defendant doesn't have to prove anything. Does everybody agree that's fair.
>
> . . . .
>
> That the defendant shouldn't have to prove he's innocent?
>
> . . . .
>
> Does that mean he can't put on proof?
>
> . . . .
>
> No. He doesn't have the burden of proof. He doesn't have to prove anything, but that doesn't mean he can't put on proof.
>
> . . . .
>
> If the defense puts on proof — calls witnesses to the stand — do you use different rules for judging the witnesses' — their witnesses' credibility than you do for the State of Tennessee's witnesses? Do you use different rules? No. You use the same rules for judging the credibility of witnesses for both sides.
>
> . . . .
>
> The defense doesn't have to put on any proof. The defendant doesn't have to testify. Judge Dailey will tell you what you already know, I submit. Has anybody ever heard that — the right to remain silent?
>
> . . . .
>
> I submit the defendant does not have to testify, and Judge Dailey will tell you what the law is. If he doesn't, you cannot hold that against

him because he doesn't have the burden of proof.
That's fair, right?

. . . .

Does that mean he can't testify? No.

The defense attorney then asked the court for a
bench conference and objected to the "last few questions
about does it mean he doesn't need — can't testify —
doesn't have to testify — tends to comment on the
shifting of the burden of proof." The trial court told
the defense attorney, "You can certainly — if you feel as
though it's been misstated, you can clarify when you get
up to address the jury." The assistant district attorney
then continued in his voir dire stating that

The state has the burden of proof, and the defense
doesn't have to put on any proof. The defendant
doesn't have to testify. He doesn't. You cannot
hold that against him. If he does choose to
testify, do you use different rules to judge his
credibility? No. Does he get bonus points for
taking the stand when he doesn't have to? No. You
use the same rules for both sides.

Prosecutorial misconduct does not constitute
reversible error unless the outcome was affected to the
defendant's prejudice. In Judge v. State, 539 S.W.2d 340,
344 (Tenn. Crim. App. 1976), this court set out the
following considerations for determining if the
prosecutor's conduct could have improperly prejudiced the
defendant and affected the verdict:

1. The conduct complained of viewed in context and
in light of the facts and circumstances of the
case.

2. The curative measures undertaken by the court
and the prosecution.

3. The intent of the prosecutor in making the
improper statement.

4. The cumulative effect of the improper conduct
and any other errors in the record.

5. The relative strength or weakness of the case.

The prosecutor's comments during voir dire were not improper. The prosecutor's statements were made to determine if the potential jurors could weigh the credibility of the defendant's testimony, if he testified, in the same way it would weigh any other witness's credibility. Additionally, the trial court gave the jury an instruction regarding the defendant's right not to testify in the jury charge. We conclude the trial court did not err in allowing the prosecutor's statements during voir dire. The defendant is not entitled to relief on this issue.

### B. Closing Argument

The defendant also contends the trial court erred by allowing the state to argue in closing that "this happens to Mexicans all the time," because the argument had no legitimate purpose and could only serve to inflame the jury. He asserts the state's closing argument asked the jury to consider helping Hispanic victims vindicate the crimes committed against them. He claims that the intent of the prosecutor was improper and that the cumulative effect of the errors at the trial is undeniable.

The state argues that the trial court did not abuse its discretion in overruling the defendant's objection to the prosecutor's closing argument about the testimony of Elpidio Torres. The state asserts the defendant did not make a specific objection and did not seek a curative instruction during the closing argument. The state asserts the prosecutor's sole intent in making the statements was to remind the jury how serious Elpidio Torres viewed the crimes committed against him and the other victims. The state also asserts the case against the defendant was very strong and argues that if the prosecutor's statements are determined to have been improper, they did not affect the verdict to the defendant's detriment. The state asserts that its finding the lesser included offenses in four of the charges reflects that the jury was not "so inflamed" that it spared the defendant no mercy.

During the state's rebuttal in closing argument, the prosecutor argued that

[The defendant's attorney] asked, "Why are we here?" He asked, "Why are you all here?" . . . why

are [the victims] here? They're not making any money being here either. They're not able to work and earn money while they're sitting here out in the witness room waiting day after day after day to come in here. What do they have to gain from this?

[Elpidio Torres] told you — when [the defendant's attorney] asked him, "Don't you think this is serious?" He said, "Yes, this is serious. This is serious because we're seeking justice because this happens to us all the time."

The defendant's attorney then said, "Object. Your Honor." The trial court immediately responded, "Overruled." The prosecutor continued arguing that

"This happens to us Mexicans all the time." And they're not just wanting to get anybody, because they didn't — to spite their chance. They're wanting to hold those responsible that are responsible — the people — or the person in this case — himthat [sic] they told you, without any doubt in their mind, the guy with the gun from both occasions.

Shortly after the defendant's objection, the trial court sent the jury out of the courtroom for a recess. The trial court explained its reasoning in overruling the defendant's objection.

Just to elaborate a little bit on my ruling on this last objection. I didn't really want to interrupt the argument as it was going on, but I did see [the defendant's attorney] —

So in the event [the defendant] is convicted and this matter goes up, the reason why I thought his argument was entirely appropriate is that in rebuttal or response what [the defendant's attorney] had argued; that "Use your common sense. Why would anyone who lives in this apartment complex rob someone not only once but why would they rob them twice and then just hang out three days later in the same apartment complex where the victims were known to live. And I think it's a perfectly reasonable inference from the facts and the testimony in the case that common sense would suggest that the victims are Hispanic and may be

30

easy prey — whose employment status may not be certain — who may be reluctant to report — who may have cash on Fridays; that under these circumstances, it may well make common sense. It's up to the jury to determine, but I think that's an appropriate response by the state to what was argued by the defense.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried."

The record reveals that the defense attorney argued in his closing argument that the defendant would not have committed a crime in the apartment complex where he lived because he would be seen there on a regular basis. The prosecutor repeated the testimony of Elpidio Torres that, "This happens to us Mexicans all the time," to rebut the defense's argument that common sense tells you the defendant would not have committed the crime in his own apartment complex. The trial court overruled the defendant's objection and did not give a curative instruction during the closing argument. However, the trial court did instruct the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements are made that you believe are not supported by the evidence, you should disregard them." Additionally, taking the statement in context with all of the proof and the arguments, we cannot say that the statement affected the verdict. The defendant is not entitled to relief on this issue.

State v. Hughey, 2006 WL 2000734, at *14-17 (alterations in original) (citations omitted).

Respondent argues that Hughey has not satisfied his burden of demonstrating that the decisions of the Tennessee Court of

Criminal Appeals on these issues are contrary to, or an unreasonable application of, clearly established federal law, or that the decisions were based on an unreasonable factual determination. (ECF No. 13 at 18.) Although Respondent has not explained his position, his point is well-taken.

The legal standards applicable to a claim of prosecutorial misconduct raised in a habeas petition are as follows:

> Under the relevant Supreme Court precedent, prosecutorial misconduct is grounds for reversal if that conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974))]. The appropriate standard for review on a claim of prosecutorial misconduct alleged in a petition for a writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." Donnelly, 416 U.S. at 642. "We do not possess supervisory powers over state court trials." Byrd v. Collins, 209 F.3d 486, 529 (6th Cir. 2000) (citing Cook v. Bordenkircher, 602 F.2d 117, 119 n.5 (6th Cir. 1979), for the proposition that "it is the responsibility of the [state courts] to police their prosecutors; we have no such authority."). As we explained in Byrd:

>> In making this determination, we must bear in mind that the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor. Therefore, even if the prosecutor's conduct was undesirable or even universally condemned, it does not constitute a due process violation unless the conduct was 'so egregious so as to render the entire trial fundamentally unfair.' Indeed, our case law demonstrates the extreme nature of prosecutorial misconduct required for a federal court to issue the writ.

> [Byrd,] 209 F.3d at 529 (internal citations and quotation marks omitted).

West v. Bell, 550 F.3d 542, 565 (6th Cir. 2008). In evaluating a claim of prosecutorial misconduct, the United States Court of Appeals for the Sixth Circuit considers the follows factors:

> If this court finds improper conduct, we consider four factors to determine whether the challenged conduct is flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. Finally, we assess the prejudicial impact of constitutional error under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson, [507 U.S. 619 (1993)].

Moore v. Mitchell, 708 F.3d 760, 799 (6th Cir. 2013) (citation omitted) (quoting Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005)) (internal quotation marks omitted).

It is unclear whether Hughey contends that the decision of the Tennessee Court of Criminal Appeals on these instances of alleged prosecutorial misconduct was contrary to, or an unreasonable application of, clearly established law as stated by the Supreme Court, as required by 28 U.S.C. § 2254(d)(1), or was based on an unreasonable factual determination, as required by 28 U.S.C. § 2254(d)(2). The decision of the Tennessee Court of Criminal Appeals was issued on direct review and, therefore, the standards applied therein differed from the due-process standard articulated in Donnelly and Darden. Therefore, the decision is properly analyzed under 28 U.S.C. § 2254(d)(2).

With respect to the prosecutor's statements during voir dire regarding a defendant's right not to testify, Hughey has not satisfied his burden. Hughey has not demonstrated that the findings of the Tennessee Court of Criminal Appeals, namely that the prosecutor's statements were not improper and that there was no prejudice in light of the jury instruction on a defendant's right not to testify, were objectively unreasonable. The comments were made during voir dire in the context of determining whether potential jurors "could weigh the credibility of [Hughey's] testimony, if he testified, in the same way it would weigh any other witness's credibility." State v. Hughey, 2006 WL 2000734, at *16. Hughey did not testify, and the prosecutor did not comment on his decision to remain silent at trial or in closing arguments.

Hughey also has not satisfied his burden of demonstrating that the factual findings of the Tennessee Court of Criminal Appeals, specifically the prosecutor's passing statement that "this happens to Mexicans all the time," was objectively unreasonable. As the Tennessee Court of Criminal Appeals noted, it is important to consider the context in which this statement was made. Hughey argued that it was illogical for an individual to commit armed robberies in the apartment complex in which he lived and where the victims were likely to recognize him. In response, the prosecutor's statement highlights the likelihood

34

that an armed robber might believe that Mexican immigrants were easy targets because they were likely paid in cash and would be reluctant to contact the police due to their legal status in the community. State v. Hughey, 2006 WL 2000734, at *17. Viewed in context, the prosecutor's remark was not improper. Moreover, in light of the strength of the prosecution's case and the passing nature of the remark, Hughey has not established that the prosecutor's remark had a substantial and injurious effect on the jury's verdict.

On direct appeal, Hughey raised his objections to the testimony of a victim regarding Hughey's state of mind during the robbery and other robberies involving Hispanic victims;[36] and argued the trial court erred by refusing to allow the victims to be questioned on their legal status in the country.[37] The Tennessee Court of Criminal Appeals denied relief on these issues, stating as follows:

> The defendant contends that the trial court erred in allowing Elpidio Torres to testify about other robberies involving Hispanic victims and to testify about the defendant's state of mind. The defendant also contends the trial court erred by not allowing the defendant to question witnesses about their status in this country. The state asserts the trial court committed no error in allowing the testimony of Elpidio Torres. It also asserts the trial court properly sustained the state's objection

---

[36]    See Br. of Def./Appellant Jermaine Hughey, at ii, 19-22, State v. Hughey, C.C.A. No. W2004-01074-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-4 at PageID 1237, 1262-65.

[37]    See id. at ii, 23-25, ECF No. 14-4 at PageID 1237, 1266-68.

35

to the defendant's asking Elpidio Torres if he was in the
United States on a current work visa.

### A. Testimony by Elpidio Torres

The defendant asserts the trial court erred in
allowing Elpidio Torres to testify that he "believe[d]
[the defendant] didn't want us to see him" and that "I
didn't want to look at him because I didn't think he
wanted me to look at him," because these statements
called for speculation. He also asserts the trial court
erred in allowing Elpidio Torres to testify that at the
time of the robbery, he was feeling "fear — what one
feels because these things happen all the time. Sometimes
they take your money and they still kill you." He asserts
that the comments became increasingly prejudicial and
that the trial court's allowing the statements led the
witness to believe that he was allowed to answer
questions inappropriately. He asserts that Elpidio Torres
answered in response to a question on cross-examination
that "it's not wasting my time because this has happened
to a lot of us Mexicans/Hispanics," and that this comment
was not appropriate or relevant and was made to inflame
the jury.

The state contends that the trial court did not err
concerning the testimony of Elpidio Torres. The state
asserts the witness testified about his own state of
mind, not the defendant's, when he said he believed the
defendant did not want them to look at him. The state
also asserts the witness's statement that robbers
sometimes kill victims was relevant because the witness's
believing that made it more likely that he was placed in
fear. The state asserts that if the trial court erred in
allowing either of these two statements, the error was
harmless beyond a reasonable doubt given the weight of
the evidence. The state asserts the defendant waived the
issue regarding the statement by the witness that "this
happened to a lot of us Mexicans" for failing to object,
failing to ask for it to be stricken from the record,
failing to ask for a curative instruction, and failing to
request a mistrial.

According to Rule 401 of the Tennessee Rules of
Evidence, evidence is relevant if it has "any tendency to
make the existence of any fact that is of consequence to
the determination of the action more probable or less
probable than it would be without the evidence." Relevant

evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The trial court has discretion in determining if evidence meets the test for relevancy. Assessing the probative value and danger of unfair prejudice regarding the evidence also falls within the trial court's discretion. This court will only reverse a trial court's decision if the trial court abused that discretion.

We first note that the defendant failed to take any corrective action or to object to Elpidio Torres' statement during cross-examination that "this happened to a lot of us Mexicans." Therefore, he has waived this issue.

The defendant contests the evidence relating to Elpidio Torres' testimony regarding his belief that the defendant did not want him or the other victims to look at the defendant. The state asked Elpidio Torres how he felt when he saw the robber with the gun, asked why he gave the defendant his money, and asked about his ability to see the defendant during the robbery. The victim responded that "I believe he didn't want us to see him" and that "I didn't want to look at him because I didn't think he wanted me to look at him." The record reflects the defendant's attorney objected the first time "to what he believes." The trial court overruled the objection. The record reflects the witness was explaining why he did not want to look at the defendant and was not testifying to the defendant's state of mind. We conclude that the testimony was relevant to the witness's description of the robbery and his ability to see the defendant and that the trial court did not abuse its discretion in allowing the testimony.

Next, the defendant contests the evidence relating to Elpidio Torres' testimony regarding robberies of other Hispanics. In response to the prosecutor's question, "What were you feeling?" Elpidio Torres responded, "It was fear — what one feels because these things happen all the time. Sometimes they take your money and they still kill you." The defendant objected "to what they do other times." The trial court overruled the objection "to the extent it satisfies one of the elements of the offense." Fear is one of the elements of aggravated robbery. Fear may be presumed from facts indicating sufficient cause

for fear. The witness responded to the question by
stating he felt fear and explained why he felt the fear.
We conclude that this testimony was relevant to explain
the witness's fear and that the trial court did not abuse
its discretion in allowing this testimony.

### B. Immigrant Status of Witnesses

The defendant contends the trial court erred by not
allowing the defendant to question witnesses about their
status in this country because the question had a good
faith basis and was relevant to prior bad acts of the
witnesses. He argues that if a person is legally in the
country, it is probative of truthfulness, because if the
person is here illegally, he or she is "lying everyday."
He asserts the trial court failed to conduct a hearing
outside the presence of the jury as required by the rule.

The state asserts that the defendant did not request
a jury-out hearing on this issue. The state argues the
witnesses' work status in the United States was not
relevant under Rule 401 of the Tennessee Rules of
Evidence. The state asserts that because the defendant
failed to request a jury-out hearing, "neither the State
nor this Court knows" if Elpidio Torres was in the
country illegally. The state also argues that an
immigrant's illegal work status is not probative of
truthfulness. The state compares an illegal work status
to criminal trespass, which this court has stated does
not involve dishonesty. The state asserts the defendant
failed to cite any authority in which a court has found
that a witness's illegal status in the United States was
probative of the witness's character for truthfulness.
The state contends that if the trial court did err, the
error was harmless beyond a reasonable doubt.

The record reflects that on cross-examination the
defendant's attorney asked Elpidio Torres, "Are you here
on a current work visa?" The prosecutor asked to approach
the judge, and a bench conference was held.

[STATE]: Object to relevance.

[DEFENDANT]: It was made relevant by [the state]
asking if he was a citizen.

38

[STATE]: It goes to explain his language. The purpose he's here and whether or not he's legal or not is irrelevant.

[DEFENDANT]: He can explain language by asking the question, "Do you speak English?"

[COURT]: I agree with that, and I agree that the question regarding citizenship may not have been relevant, but there was no objection to that, and I don't see any relevance to going any deeper into it.

[DEFENDANT]: But I say it's now become relevant based on the direct examination —

[COURT]: Well, had there been an objection at the time, I might have sustained it — in all likelihood I would have sustained it; but at this point, I just don't think it's relevant, and I'll sustain —

[DEFENDANT]: And I apologize if I didn't make my point clear. I didn't object, and I'm not suggesting that I'm objecting now; but because the state put it into relevance, and that is the reason I want to ask about his status here is because [the state] asked, on direct, whether or not he was a citizen of this country.

[COURT]: And he said he was not. There's no need to go any further.

"The propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the sound discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right.

According to Rule 401 of the Tennessee Rules of Evidence, evidence is relevant if it has "any tendency to

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "All relevant evidence is admissible. . . . Evidence which is not relevant is not admissible." <u>See</u> Tenn. R. Evid. 402. Relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. A trial court has the discretion to determine if evidence meets the test for relevancy.

Pursuant to Rule 608(b) of the Tennessee Rules of Evidence, specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. Before a witness can be questioned about the specific instance of conduct, the trial court, <u>upon request</u>, must hold a hearing to determine if "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1).

We first note that the defendant did not request that the trial court conduct a hearing to determine the probative value of Elpidio Torres' immigration status and that it was the defendant's responsibility to request such a hearing. Additionally, the defendant did not argue that Elpidio Torres' immigration status was probative of truthfulness but simply argued that it was relevant based on the witness's direct examination. The defendant now argues on appeal that this evidence was relevant under Rule 608 because it was probative of the witness's truthfulness. "As a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." <u>State v. Leach</u>, 148 S.W.3d 42, 55 (Tenn. 2004). The trial court concluded that the witness's immigrant status in this country was not relevant to the issues on trial. We cannot conclude that the trial court abused its discretion. The defendant is not entitled to relief on this issue.

<u>State v. Hughey</u>, 2006 WL 2000734, at *11-14 (alterations in original) (citations omitted).

Respondent argues that this aspect of Claim 3 is barred by procedural default because "Hughey argued these claims as violations of Tennessee state evidentiary law on appeal rather than as issues of federal law." (ECF No. 13 at 18.) A prisoner exhausts a claim by "fairly present[ing]" it to the appropriate trial and appellate courts. Baldwin, 541 U.S. at 29.

> Whether a claim is fairly presented to a state court as a federal constitutional issue is determined by the claim's: (1) reliance on federal cases employing constitutional analysis; (2) reliance on state cases employing federal constitutional analysis; (3) phrasing in terms of constitutional law; or (4) allegations of facts that are well within the mainstream of constitutional law.

Hruby v. Wilson, 494 F. App'x 514, 517 (6th Cir. 2012) (citing Newton v. Million, 349 F.3d 873, 877 (6th Cir. 2003), abrogated on other grounds by English v. Berghuis, No. 09-2632, 2013 WL 3455482 (6th Cir. July 10, 2013)). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000).

In his brief to the Tennessee Court of Criminal Appeals on direct appeal, Hughey presented his challenge to Elpidio Torres's testimony about other robberies involving Hispanic victims and his state of mind as a state-law issue.[38] Hughey relied on

---

[38]   See Br. of Def./Appellant Jermaine Hughey, at 19-22, State v. Hughey, C.C.A. No. W2004-01074-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-4 at PageID 1262-65.  Hughey's brief erroneously refers to Elpidio Torres as "Eldido Aaron Savin." See id. at 19, ECF No. 14-4 at PageID 1262.

Tennessee Rules of Evidence 401, 402, and 403 and three Tennessee cases interpreting those rules, namely, State v. Dulsworth, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989), perm. app. denied (Tenn. Oct. 2, 1989); State v. Hill, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994), perm. app. denied (Tenn. Sept. 12, 1994); and State v. Hayes, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995), perm. app. denied (Tenn. May 8, 1995). None of the cited state-court decisions employed federal constitutional analysis or referred to the denial of a specific constitutional right.

Similarly, Hughey's direct-appeal brief relied on state evidentiary law in support of his claim that the trial court erred in refusing to allow him to question the victims about their immigration status.[39] Hughey cited Tennessee Rule of Evidence 608 and State v. Morgan, 541 S.W.2d 385 (Tenn. 1976), which addressed Rule 608, in support. Nothing in Hughey's brief to the Tennessee Court of Criminal Appeals would have alerted that court that Hughey was presenting a claim of judicial misconduct arising under the United States Constitution.

Because there is no longer any means of exhausting Hughey's judicial-misconduct claims in state court, the Court finds these aspects of Claim 3 are barred by procedural default.

---

[39]    See Br. of Def./Appellant Jermaine Hughey, at 23-25, State v. Hughey, C.C.A. No. W2004-01074-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-4 at PageID 1266-68.

For the foreground reasons, the Court finds Claim 3 is without merit and is, therefore, DISMISSED.

## C.   **Excessive Sentences ("Claim 4")**

In his fourth claim, Hughey argues that his sentences were excessive. (ECF No. 1 at 27-29.) Hughey emphasizes that he had no criminal history. (Id. at 27.) He also states that the imposition of consecutive sentences violated his rights under the Sixth and Fourteenth Amendments in light of the Supreme Court's decisions in Blakely v. Washington, 542 U.S. 296 (2004), and Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), and the decision of the Tennessee Supreme Court in State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007). (ECF No. 1 at 27-28.) Hughey also challenges the application of certain enhancement factors. (Id. at 28.) Finally, Hughey asserts that his appellate counsel was ineffective in failing to include the presentence report in the record on direct appeal. (Id. at 28-29.)[40]

Hughey previously raised a challenge to his sentences on direct appeal,[41] and the Tennessee Court of Criminal Appeals rejected it on the merits, stating as follows:

> The defendant contends that the trial court erred in applying enhancement factors and in ordering consecutive sentencing. The state responds that the defendant waived review of sentencing for failing to include in the record

---

[40]   This issue will be addressed in connection with Claim 2, infra.

[41]   Br. of Def./Appellant Jermaine Hughey at iii, 40-43, State v. Hughey, C.C.A. No. W2004-01074-CCA-R3-CD (Tenn. Crim. App.), ECF No. 14-4 at PageID 1238, 1283-86.

a copy of the presentence report and copies of the letters written on the defendant's behalf. It asserts the state made it clear it was relying on the presentence report, referring to it five times during the sentencing hearing. It asserts the defendant has the burden of showing that sentencing is improper and must provide this court with all the materials it must have to conduct a de novo review. The state also argues the trial court properly sentenced the defendant.

At the sentencing hearing, Memphis Police Detective Miguel Aguila testified that in the last few years, targeting Hispanics to be victims of crimes had become common. He said that approximately eighty percent of the home invasion robberies he had investigated involved Hispanic victims. He said the language barrier created special problems in catching and prosecuting the suspects. He said Hispanic victims were reluctant to report crimes because they had difficulty in communicating. He said he had investigated some cases where the victims were victimized two, three, or four times. He said that there was "a percentage of illegal residents" in Memphis and that they were hesitant to call the police because they were afraid of deportation. He said that the majority of Hispanic victims save the money they get paid once a week and that at the end of the month, they mail the money to their families in Mexico. He said the members of the Hispanic community were being targeted because of their racial and language differences.

The state told the trial court it would rely on the defendant's presentence report and did not present any further proof. The presentence report was not introduced as an exhibit. The presentence report also has not been included in the record. The defendant submitted thirteen letters written on behalf of the defendant to the trial court but did not enter those letters as exhibits. The letters also have not been included in the record.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. [Tenn. Code Ann.] § 40-35-401(d) (2003).[42] As the Sentencing Commission Comments

---

[42] The Court of Criminal Appeals stated, in a footnote, "We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections
(continued...)

to this section note, the burden is now on the appealing
party to show that the sentencing is improper. This means
that if the trial court followed the statutory sentencing
procedure, made findings of fact that are adequately
supported in the record, and gave due consideration and
proper weight to the factors and principles that are
relevant to sentencing under the 1989 Sentencing Act, we
may not disturb the sentence even if a different result
were preferred.

However, "the presumption of correctness which
accompanies the trial court's action is conditioned upon
the affirmative showing in the record that the trial
court considered the sentencing principles and all
relevant facts and circumstances." State v. Ashby, 823
S.W.2d 166, 169 (Tenn. 1991). In this respect, for the
purpose of meaningful appellate review,

the trial court must place on the record its
reasons for arriving at the final sentencing
decision, identify the mitigating and enhancement
factors found, state the specific facts supporting
each enhancement factor found, and articulate how
the mitigating and enhancement factors have been
evaluated and balanced in determining the sentence.
[Tenn. Code Ann.] § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994). Also,
in conducting a de novo review, we must consider (1) the
evidence, if any, received at the trial and sentencing
hearing, (2) the presentence report, (3) the principles
of sentencing and arguments as to sentencing
alternatives, (4) the nature and characteristics of the
criminal conduct, (5) any mitigating or statutory
enhancement factors, (6) any statement that the defendant
made on his own behalf, and (7) the potential for
rehabilitation or treatment.

The sentence to be imposed by the trial court is
presumptively the minimum in the range for a Class B
felony or Class C felony unless there are enhancement
factors present. Procedurally, the trial court is to
increase the sentence within the range based upon the

---

[42]     (...continued)
40-35-102, -114, -210, and -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6,
8. However, the amended code sections are inapplicable to the defendant's
appeal." State v. Hughey, 2006 WL 2000734, at *21 n.2.

existence of enhancement factors and, then, reduce the
sentence as appropriate for any mitigating factors. The
weight to be afforded an existing factor is left to the
trial court's discretion as long as it complies with the
purposes and principles of the 1989 Sentencing Act and
its findings are adequately supported by the record.

Initially we note that the defendant has hampered
our de novo review by failing to include the presentence
report in the record on appeal. It is incumbent upon the
appellant to prepare a record that conveys a fair,
accurate, and complete account of what transpired
relative to the issues on appeal. This rule applies to
sentencing hearings. In the absence of an appropriate
record, we must presume that the trial court's
determinations are correct.

A. Application of Enhancement and Mitigating Factors

The defendant asserts the trial court imposed an
excessive sentence because he had a minimal criminal
history. He acknowledges the trial court considered the
enhancement and mitigating factors submitted by the
parties but asserts the trial court did not apply the
sentencing principles. The defendant asserts that he had
only two prior simple possession of marijuana charges.
The defendant asserts the trial court erred in applying
enhancement factor (3), that the defendant was "a leader
in the commission of the offense involving two (2) or
more actors," to both robberies. See [Tenn. Code Ann.]
§ 40-35-114(3). The state asserts the trial court
correctly applied the three enhancement factors.

The trial court found that the following enhancement
factors applied: (2) the defendant had a previous history
of criminal convictions or criminal behavior, (3) the
defendant was the leader in the commission of the
offense, and (23) the defendant intentionally selected
the victims in whole or in part because of the
defendant's "belief or perception regarding the race
. . . national origin, ancestry or gender" of the
victims. See [Tenn. Code Ann.] § 40-35-114(2), (3), (23).
The trial court applied enhancement factor (2) based upon
proof that the defendant "does have a previous history of
criminal convictions or criminal behavior in addition to
those necessary to establish the appropriate range." In
applying enhancement factor (3), the trial court found
the defendant was "obviously the one that set up the

46

robbery and targeted these victims because he was the one who robbed them three or four weeks earlier." In applying enhancement factor (23), the trial court found this factor to be the most important of all the enhancement factors based on the testimony that had been presented at the sentencing hearing.

The defendant presented three mitigating factors for consideration by the trial court: (1) the defendant's conduct did not threaten or cause bodily injury; (6) the defendant, because of his youth lacked substantial judgment in committing the offense; and (13) the defendant had a minimal criminal history. See [Tenn. Code Ann.] § 40-35-113(1), (6), (13). The trial court rejected all three mitigating factors. The trial court found the defendant did not qualify as a youth because he was twenty-one or twenty-two years old. It found that although shots were not fired, shots were threatened, and the victims' lives were threatened. The trial court made no specific finding on the minimal criminal history not being a mitigating factor.

With regard to enhancement factor (2), that the defendant had a history of criminal convictions or criminal behavior, we must presume that the trial court's application was proper because of the absence of the defendant's presentence report from the record. With regard to enhancement factor (23), that the defendant selected the victims based on their race or national origin, the defendant did not assert that this enhancement factor was incorrectly applied. The state presented evidence at the sentencing hearing about Hispanics being the targets of robberies. The record reflects the defendant lived in the same apartment complex and targeted these particular victims on two different occasions. The trial court stated that

> But the obvious counter to that is he did go back
> and rob the same people a second time because they
> were Hispanic, because he knew or thought he knew,
> he felt that they wouldn't report it and he would
> be home free because they were Hispanic.

We conclude that enhancement factor (23) was properly applied by the trial court.

With regard to enhancement factor (3), that the defendant was the leader in the commission of the

offense, the defendant contends the trial court should not have applied this factor to the first robbery. We agree with the defendant that this factor does not apply to the first robbery. The trial court found that the three enhancement factors applied and applied the three factors to all convictions. The trial court did not distinguish between the convictions for the first robbery in Case No. 03-00283 and the convictions for the second robbery in Case No. 03-00284. All four of the victims testified that one man, the defendant, robbed them on the first occasion. We conclude enhancement factor (3) does not apply to Case No. 03-00283.

We conclude that the mitigating factors (1), (6), and (13) do not apply in this case. The defendant did threaten serious bodily injury by pointing a gun at the victims and demanding the victims give them money, therefore, mitigating factor (1) does not apply. With regard to mitigating factor (6), that because of defendant's youth he lacked substantial judgment in committing the offense, the record reflects the defendant was twenty-four years old when he committed the robberies. We have no other information regarding the defendant's education, experience, or mental health because the presentence report was not included in the record. Therefore, we must presume that the trial court's rejection of mitigating factor (6) was correct. With regard to mitigating factor (13), that the defendant had a minimal criminal history, we also must presume that the trial court's rejection of mitigating factor (13) was proper because of the absence of the defendant's presentence report from the record.

We conclude that the trial court properly applied the enhancement factors to the conviction arising from the second robbery in Case No. 03-00284. However, we conclude that the trial court improperly applied enhancement factor (3) to the convictions arising from the first robbery in Case No. 03-00283. We note that the trial court stressed that enhancement factor (23) was the most important of the three enhancement factors it applied and that the trial court did not say how much weight it gave to the other two factors. Because the presentence report was not included in the record on appeal, we are unable to conduct a full de novo review of the sentences in Case No. 03-00283. In the absence of an appropriate record, we must presume that the trial

48

court's determinations are correct. The defendant is not entitled to relief on this issue.

<u>B. Consecutive Sentencing</u>

The defendant acknowledges it is hard to argue that the two cases should not run consecutively but asserts the trial court erred in ordering the aggravated robbery in Case No. 03-00283 of the first indictment to run consecutively to all the other sentences. He contends that the trial court erred in finding the defendant was a dangerous offender whose actions indicated little or no regard for human life and that the trial court did not consider the fact that no shots were fired and no one was injured. He argues that there was nothing extraordinary about the crimes and that the defendant has no history to lead the trial court to believe consecutive sentencing is necessary to protect the public.

The state contends the trial court properly sentenced the defendant. It argues that the trial court properly found the defendant was a dangerous offender whose behavior indicates little or no regard for human life and that consecutive sentencing was reasonably related to the severity of the offenses and necessary to protect the public.

The trial court found that the two cases No. 03-00283 and No. 03-00284 should be served consecutively because the defendant was a dangerous criminal and from a public policy standpoint the cases should be consecutive. It stated that

> [F]actoring in what I think is a clear and fair conclusion from the facts of this case, factoring in the fact that he targeted these people because they were Hispanics and certainly targeted them the second time for that reason, this makes him a particularly dangerous offender.
>
> . . . .
>
> I think that makes him a particularly dangerous offender to be of a mind-set to commit this type of offense against these victims, same place, same place where he lives, short period of time. I think in my opinion makes this factor apply.

And then the remaining two factors, consecutive sentences reasonably relate to the severity of the offenses and are necessary in order to protect the public from further serious conduct by this defendant. I think they apply as well when you read the transcript and review the facts of this case and the unique circumstances of the victims.

. . . If a person were allowed to commit an aggravated robbery and then go commit another one and commit another one and commit another one and serve concurrent time for it all, then there would be no deterrent at all from committing additional offenses.

The trial court also found that the three attempted aggravated robbery convictions should be served consecutively to the aggravated robbery conviction in Case No. 03-00283. The trial court stated that

[T]he one instance in which I think should be consecutive time is that first offense where he confronted [the victim] on the outside smoking a cigarette and forced him at gunpoint to go back inside the apartment. He could have completed his robbery then and there and left. But he elected to force this man back into the apartment where these many people were and continue the robbery. So I think that that offense should be served for the same reason as I indicated with regard to the two sets of offenses consecutively.

The defendant acknowledges, "it is hard to argue that separate incidents should not be sentenced in a consecutive manner." The defendant robbed four victims at gunpoint and later robbed three of the same victims again at gunpoint. During the first robbery, the defendant forced Mr. Gutierrez inside the apartment. He told the victims, including a pregnant woman, to lie down on the floor and demanded their money. During the second robbery, the defendant, along with an accomplice, walked up to the four victims in the middle of the apartment complex's parking lot. The defendant pointed a gun at the victims while his accomplice went through the victims' pockets. The trial court noted the "brazenness" and "arrogance" involved in robbing people living in his own apartment complex where he knew the victims would see him

50

again. The trial court found that the defendant was a dangerous offender, that consecutive sentencing reasonably relates to the severity of this offense, and that the defendant needs to be incarcerated to protect society from his future criminal conduct. We agree. The defendant is not entitled to relief on this issue.

State v. Hughey, 2006 WL 2000734, at *20-25 (footnote omitted)(citations omitted).

In his brief response to the sentencing issue, Respondent asserts that "[t]his claim is procedurally defaulted because Hughey did not raise a Blakely challenge in either his direct or post-conviction briefs to the Tennessee Court of Criminal Appeals, which were both decided after Blakely was issued." (ECF No. 13 at 19.) Respondent is correct. Hughey's brief to the Tennessee Court of Criminal Appeals on direct appeal raised the sentencing issues solely on state-law grounds. See supra p. 43 n.41. Hughey also did not raise a Sixth Amendment challenge to his sentences in the post-conviction appeal.[43] Because there is no longer any means of exhausting this issue in state court, the Court finds Claim 4 is barred by procedural default.

For the foregoing reasons, the Court finds Claim 4 is without merit and is, therefore, DISMISSED.

### D.  Ineffective Assistance of Counsel (Claim 2)

In his second claim, Hughey asserts that his attorneys rendered ineffective assistance, in violation of the Sixth

---

[43]   See Br. of Appellant, Hughey v. State, C.C.A. No. W2009-01072-CCA-R3-PC (Tenn. Crim. App.), ECF No. 14-10.

Amendment. (ECF No. 1 at 7-8, 21-23.) Specifically, Hughey

complains that Mark Mesler, the attorney who represented him at

the sentencing hearing and on direct appeal, failed to include

the presentence report in the appellate record. (Id. at 21-23.)

Hughey raised this issue in the post-conviction proceeding

and in the post-conviction appeal. The post-conviction court

denied relief, stating as follows:

> An evidentiary hearing was held on December 17,
> 2008, and March 30, 2009. At the December 17 hearing, the
> petitioner testified that he was represented by one
> lawyer at trial and a different lawyer at the motion for
> new trial, sentencing hearing, and on appeal because his
> first lawyer was allowed to withdraw his representation.
> He said that he and appellate counsel[44] got along and
> that he had no concerns about how counsel handled the
> sentencing hearing, except that he later wished counsel
> had called some of his family members to testify on his
> behalf.
>
> On cross-examination, the petitioner acknowledged
> that appellate counsel forcefully argued at the
> sentencing hearing that he should receive a shorter
> sentence based on the fact that no shots were fired and
> his criminal history was minimal. He further acknowledged
> that the trial court stated at the hearing that the most
> important enhancement factor on which it was basing the
> sentences was that the petitioner had intentionally
> selected the victims because of their race.
>
> Appellate counsel testified that he had been a
> criminal defense attorney since August 1994 and had
> handled "a great many" trials, as well as appeals, during
> his career. He said that the petitioner's family hired
> him approximately two or three weeks before the
> sentencing hearing because trial counsel was relieved

---

[44]     The Court of Criminal Appeals stated, in a footnote, that, "[f]or
simplicity's sake, we have elected to refer to the lawyer who represented the
petitioner at trial as 'trial counsel' and to the lawyer who began his
representation with the motion for new trial as 'appellate counsel.'" Hughey v.
State, 2010 WL 1610581, at *1 n.1.

from representation due to a conflict of interest that developed after trial. Prior to the sentencing hearing, appellate counsel reviewed the presentence report and talked to the petitioner's family, a number of whom wanted to testify on the petitioner's behalf at the hearing. However, because he was of the opinion that none of the family members had anything to say that would not "have come across as angry and bitter about the verdict in the trial," appellate counsel advised them to write letters of support instead.

Appellate counsel testified that he argued the petitioner's minimal criminal history at the sentencing hearing, but the trial court, in sentencing, placed great weight on the fact that the petitioner had allegedly targeted the victims because of their race. Appellate counsel explained that he did not have the presentence report admitted as an exhibit to the hearing or included in the record on appeal because he had never done so in the forty-plus appeals he had handled prior to the petitioner's case, never seen it done in any other cases he had reviewed or observed, and had always assumed that the presentence report, which was routinely ordered by the trial court prior to sentencing and placed in the jacket, was automatically included in the technical record on appeal. Consequently, he was "quite shocked" when the direct appeal opinion was released stating that he had failed to include the presentence report in the record. In his opinion, the appellate court was "sort of sidestepping the issue" because the trial court referred exclusively to the report in its ruling and "all of the pertinent parts of the Presentence Report were all there in front of the [Court of Criminal Appeals] in the transcript form."

. . . .

On May 8, 2009, the post-conviction court entered a detailed written order denying the petition for post-conviction relief. . . . The court further found that the petitioner had not shown that any prejudice resulted from appellate counsel's failure to have the presentence report admitted as an exhibit to the sentencing hearing or included in the record of the direct appeal.

. . . .

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact.

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. [Strickland v. Washington, 466 U.S. 668, 687 (1984)]; see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)[]. The

reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

. . . .

The post-conviction court made the following findings of fact and conclusions of law with respect to the petitioner's claim of ineffective assistance of appellate counsel:

> This Court finds that Petitioner has, again, failed to show that he was prejudiced in any way by appellate counsel's failure to introduce into evidence the presentence report. It is obvious that the sentencing court and [appellate counsel] discussed [the petitioner's] criminal history during the sentencing hearing. Actually, a review of Petitioner's criminal history contained in Exhibit # 1 [presentence report] to this hearing shows only one misdemeanor conviction. However, it is clear to this Court, and [a]ppellate counsel freely acknowledges, that the sentencing court based its decision for the sentence on Enhancement Factor # 23, that Petitioner targeted a certain race of people in selecting his victims and committing his crimes. Thus, Petitioner ha[s] failed to prove that introduction of the presentence report would have resulted in a lower sentence. It is for this reason that this issue must be denied.

As the post-conviction court noted, the record establishes that the trial court based its enhanced sentences primarily on the fact that the petitioner targeted the victims because of their race. We, therefore, agree with the post-conviction court that the petitioner cannot establish that he was prejudiced by the fact that the presentence report was not included as an

> exhibit to the sentencing hearing or in the record of the
> direct appeal.

Hughey v. State, 2010 WL 1610581, at *1-6 (footnote omitted)
(citations omitted).

A claim that ineffective assistance of counsel has deprived
a habeas petitioner of his Sixth Amendment right to counsel is
controlled by the standards stated in Strickland v. Washington,
466 U.S. 668 (1984). To demonstrate deficient performance by
counsel, a petitioner must demonstrate that "counsel's
representation fell below an objective standard of
reasonableness." Id. at 688. "A court considering a claim of
ineffective assistance must apply a 'strong presumption' that
counsel's representation was within the 'wide range' of
reasonable professional assistance. The challenger's burden is to
show 'that counsel made errors so serious that counsel was not
functioning as the "counsel" guaranteed the defendant by the
Sixth Amendment.'" Harrington v. Richter, 131 S. Ct. 770, 787
(2011) (citations omitted) (quoting Strickland, 466 U.S. at 687,
689).

To demonstrate prejudice, a prisoner must establish "a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
Strickland, 466 U.S. at 694.[45] "A reasonable probability is a

---

[45]      "[A] court need not determine whether counsel's performance was
deficient before examining the prejudice suffered by the defendant . . . ."
(continued...)

probability sufficient to undermine confidence in the outcome."
Id. at 694. "It is not enough 'to show that the errors had some
conceivable effect on the outcome of the proceeding.' Counsel's
errors must be 'so serious as to deprive the defendant of a fair
trial, a trial whose result is reliable.'" Richter, 131 S. Ct. at
787-88 (citations omitted) (quoting Strickland, 466 U.S. at 687,
693); see also id. at 791-72 ("In assessing prejudice under
Strickland, the question is not whether a court can be certain
counsel's performance had no effect on the outcome or whether it
is possible a reasonable doubt might have been established if
counsel acted differently. . . . The likelihood of a different
result must be substantial, not just conceivable." (citations
omitted)); Wong v. Belmontes, 558 U.S. at 15, 27 (2009) (per
curiam) ("But Strickland does not require the State to 'rule out'
[a more favorable outcome] to prevail. Rather, Strickland places
the burden on the defendant, not the State, to show a 'reasonable
probability' that the result would have been different.").

A criminal defendant is entitled to the effective assistance
of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 396
(1985). The failure to raise a nonfrivolous issue on appeal does
not constitute per se ineffective assistance of counsel, as
"[t]his process of winnowing out weaker arguments on appeal and

---

[45] (...continued)
Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it
need not determine whether, in fact, counsel's performance was deficient. Id. at
697.

focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983)) (internal quotation marks omitted). Claims of ineffective assistance of appellate counsel are evaluated using the <u>Strickland</u> standards. <u>Smith v. Robbins</u>, 528 U.S. 259, 285-86 (2000) (applying <u>Strickland</u> to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief). Thus, to establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal — that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

<u>Smith v. Robbins</u>, 528 U.S. at 285 (citations omitted).[46]

---

[46]   The Sixth Circuit has stated a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1.   Were the omitted issues "significant and obvious?"

2.   Was there arguably contrary authority on the omitted issues?

3.   Were the omitted issues clearly stronger than those presented?

4.   Were the omitted issues objected to at trial?

5.   Were the trial court's rulings subject to deference on appeal?

6.   Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7.   What was the appellate counsel's level of experience and
                                            (continued...)

"Surmounting <u>Strickland</u>'s high bar is never an easy task."

<u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under <u>de novo</u> review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

<u>Richter</u>, 131 S. Ct. at 788 (quoting <u>Strickland</u>, 466 U.S. at 689-90).

When an ineffective-assistance claim is reviewed under § 2254(d), the review is "doubly deferential." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).

---

[46]   (...continued)
expertise?

8.   Did the petitioner and appellate counsel meet and go over possible issues?

9.   Is there evidence that counsel reviewed all the facts?

10.   Were the omitted issues dealt with in other assignments of error?

11.   Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

<u>Franklin v. Anderson</u>, 434 F.3d 412, 429 (6th Cir. 2006) (quoting <u>Mapes v. Coyle</u>, 171 F.3d 408, 427-28 (6th Cir. 1999)) (internal quotation marks omitted).

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 131 S. Ct. at 788 (citations omitted).

Hughey's Petition does not state whether he contends that the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, Strickland v. Washington, or whether it was based on an unreasonable factual determination. The decision was a run-of-the-mill case applying the correct legal standard from Strickland to the facts of Hughey's case and, therefore, the "contrary to" clause is inapplicable.

Hughey also cannot satisfy his burden of demonstrating that the state-court decision was an unreasonable application of Strickland or was based on an objectively unreasonable factual determination. A copy of the presentence report was included in the record of the post-conviction appeal. (See ECF No. 14-3 at PageID 1141-49.) The presentence report reflects that Hughey had a previous conviction, obtained on September 12, 2001, for marijuana possession, where he was sentenced to two days in jail

and received a $250 fine. (<u>Id.</u> at PageID 1145.) The presentence report also indicates a previous adult charge for marijuana possession was dismissed on May 21, 1988. (<u>Id.</u>) Hughey also had two juvenile charges for theft of property and malicious mischief, both of which were adjusted nonjudicially. (<u>Id.</u> at 1146.)

At the sentencing hearing, defense counsel made the sentencing judge aware of the nature of Hughey's prior record.[47] The State also spent little time on Hughey's prior record, referring generally to the presentence report and stating that Hughey also admitted using marijuana in the past.[48] The State accurately stated that Hughey "does have numerous run-ins with the law, whether they were adjudicated nonjudically, whether he successfully completed a diversion program, or whether as Mr. Mesler put it he only paid a fine."[49] The prosecutor admitted that Hughey was a Range I offender "because of the offenses Mr. Mesler said were minimal. That's why they're enhancement factors. He does have a criminal history in addition to that necessary to make him a Range One offender."[50]

---

[47]     February 24, 2004, Sentencing Hr'g Tr. at 27, <u>State v. Hughey</u>, No. 03-00283-84 (Shelby Cnty. Crim. Ct.), ECF No. 14-2 at PageID 1028.

[48]     <u>Id.</u> at 20-21, ECF No. 14-2 at PageID 1021-22.

[49]     <u>Id.</u> at 34:10-13, ECF No. 14-2 at PageID 1035:10-13.

[50]     <u>Id.</u> at 34:14-17, ECF No. 14-2 at PageID 1035:14-17.

The sentencing court's findings make clear that, in finding that Hughey had a criminal record or a record of criminal behavior, it was aware of the nature and seriousness of that record:

> Well, to address the enhancement factors, first, he does have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. If he were one of these multiple offenders, major violators that Mr. Mesler alluded to in his argument that are tried often in this court, he wouldn't be in Range One. I mean, that's why you have the different ranges. And so if he had a lengthy record, then he would be Range Two, Range Three, Career Criminal or whatever. The fact that he is Range One is what it is. You don't have to have any prior felony convictions to be Range One. Therefore, any criminal convictions or behavior would satisfy this factor. And so it is satisfied.
>
> And these four offenses for which he has been found guilty, adjudicated twice as a juvenile and then twice as an adult, it's not four felony offenses but then again he is Range One. If they had been four felony offenses, he would have been a different range. So within the context of Range One this is satisfied. I'm satisfied.[51]

The trial court then went on to discuss the other enhancement factors and stated that the most important factor was that Hughey selected his victims on the basis of their ethnicity.[52] The trial court also concluded that Hughey was a "particularly dangerous offender" because he targeted his victim on the basis of their ethnicity and because of the "brazenness" and "arrogance" of the

---

[51]   Id. at 35:15-36:8, ECF No. 14-2 at PageID 1036:15-1037:8.

[52]   Id. at 36-38, ECF No. 14-2 at PageID 1037-39.

manner in which he committed the crimes in the apartment complex where he lived.[53]

These facts were in the record before the Court of Criminal Appeals, which stated only that it must presume that the trial court's application of the enhancement factor was correct. State v. Hughey, 2006 WL 2000734, at *22. Hughey has not satisfied his burden of establishing that, if only the presentence report were in the record on direct appeal, there is a reasonable probability that the outcome of his direct appeal would have been different. The sentencing judge does not appear to have made a factual mistake, and Hughey has identified no legal error in his application of this sentencing factor. Therefore, the Court finds Hughey has not demonstrated that the opinion of the Tennessee Court of Criminal Appeals on the post-conviction appeal was an unreasonable application of Strickland or that it was based on an unreasonable factual determination.

Accordingly, the Court finds the second issue is without merit and is, therefore, DISMISSED.

Because every claim asserted by Petitioner is without merit, the Court DENIES the petition pursuant to 28 U.S.C. § 2254. The petition is, therefore, DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

---

[53]    Id. at 40, ECF No. 14-2 at PageID 1041.

## V.   APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. Miller-El v. Cockrell, 537 U.S. 322, 335 (2003); accord Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005) (per curiam). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the U.S. District Courts ("§ 2254 Rules"). A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. § 2253(c)(2)-(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)) (internal quotation marks omitted). A COA does not require a showing that the appeal will succeed. Id. at 337; Caldwell v. Lewis, 414 F.

App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. <u>Bradley</u>, 156 F. App'x at 773.

In the instant case, there can be no question that Petitioner's claims are meritless for the reasons previously stated. Because any appeal by Petitioner on the issues raised in this Petition does not deserve attention, the Court DENIES a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court. <u>See</u> Fed. R. App. P. 24(a)(4)-(5). In the instant case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.

It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal in forma pauperis is, therefore, DENIED.[54]

**IT IS SO ORDERED,** this 30th day of September, 2013.

/s/ Jon P. McCalla
UNITED STATES DISTRICT JUDGE

---

[54]   If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days of the date of entry of this Order. See Fed. R. App. P. 24(a)(5).